In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-4333

INDIANA RIGHT TO LIFE, INC. and
ARLINE SPRAU,

*Plaintiffs-Appellees,*

*v.*

RANDALL T. SHEPARD, in his official capacity
as a member of the Indiana Commission
on Judicial Qualifications, JAMES O. MCDONALD,
in his official capacity as a member of the
Indiana Commission on Judicial Qualifications,
JUDY J. JACKSON, in her official capacity as
a member of the Indiana Commission on Judicial
Qualifications, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division at Lafayette.
No. 04 C 71—**Allen Sharp,** *Judge.*

ARGUED SEPTEMBER 14, 2007—DECIDED OCTOBER 26, 2007

Before BAUER, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Indiana Right to Life and Arline
Sprau (we will refer to them collectively as Right to Life)
filed this complaint against the Indiana Commission on
Judicial Qualifications and the Indiana Disciplinary

Commission, contending that two canons in the Indiana Code of Judicial Conduct violate their First Amendment rights. The district court agreed that one of the canons was unconstitutional and the state defendants appeal.

The canon at issue—Canon 5A(3)(d)(i) and (ii)—provides:

> A candidate, including an incumbent judge, for a judicial office . . . shall not: (i) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; (ii) make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court.

In the parlance of cases such as the one before us, the two clauses in this canon are referred to respectively as "pledges" and "commitments" clauses. The contention that the clauses are unconstitutional grows out of *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), which declared unconstitutional a provision in Minnesota's Code of Judicial Conduct. The provision, commonly called an "announce" clause, stated that a candidate for judicial office shall not "announce his or her views on disputed legal or political issues." The clause, the Court said, covered much more than promising to decide an issue a particular way; it prohibited merely stating a candidate's current position, even if he did not bind himself to maintain that position after the election. That broad a prohibition was found to violate the First Amendment. The more limited provisions—pledges or promises clauses—were not challenged, and on those clauses, the Court specifically said it "express[ed] no view." It is with its eye on invalidating the latter clauses that various groups have filed lawsuits throughout the country. *See, e.g.*, *Pennsylvania Family Institute v. Black*, 489 F.3d 156 (3rd Cir. 2007); *Alaska Right to Life v. Feldman*, ___ F.3d ___, 2007 WL 2743603 (9th Cir. 2007).

The hurdle the organizations face, however, is in showing that they are injured by the canons—in establishing that they have standing to bring the case or in showing that the case is ripe for adjudication. With those issues in mind, we turn to the facts in Indiana.

Most, but not all, judges in Indiana are elected in the first instance. Others are appointed but then must run for retention. The Indiana Supreme Court promulgates and enforces professional conduct rules for judges. The Indiana Code of Judicial Conduct consists of a preamble and five canons, which cover a broad array of conduct. The Indiana Commission on Judicial Qualifications and the Indiana Disciplinary Commission are arms of the supreme court. The Commission on Judicial Qualifications (which body we refer to when we say Commission) advises judges concerning the Code, both formally and informally. The Commission's legal counsel, Margaret Babcock, advises judicial candidates as to whether a proposed course of conduct violates the Code.

When the Commission receives a complaint that a judge has violated the Code, it investigates the case and prosecutes the judge if appropriate. In a prosecution, the Commission's counsel acts as prosecutor. The Commission may issue a disciplinary recommendation, which can be appealed to the Indiana Supreme Court. The Disciplinary Commission has similar jurisdiction to enforce the canons against judicial candidates, who are not yet judges. Discipline can include a private reprimand, public censure, suspension, removal from the bench, or disbarment.

The present Code of Judicial Conduct is drawn from the Model Code, adopted by the American Bar Association in 1990. The Model Code removed the "announce" canon and added a "commitments" canon. In 1993, the Indiana Supreme Court did the same. It was later, in June 2002, that the U.S. Supreme Court struck down Minnesota's

"announce" canon. Following the decision, the Indiana Commission issued Preliminary Advisory Opinion #1-02. It expresses the hope that judicial candidates will focus their campaigns "on the promotion of the impartiality and integrity of the judiciary." It goes on, somewhat reluctantly it seems, to state that "candidates are permitted under the first amendment to state their general views about disputed social and legal issues" and to "express themselves on any number of other philosophies or perspectives."

It is in this context that Indiana Right to Life sent questionnaires to judicial candidates in 2002. The questionnaires covered topics such as abortion and physician-assisted suicide. Candidates were asked whether they agreed that "the unborn child is biologically human and alive and that the right to life of human beings should be respected at every stage of their biological development." They were asked whether they agreed that "*Roe v. Wade* was wrongly decided." Only nine out of a bevy of candidates provided substantive responses to the questionnaire. There is no evidence that the Commission instituted discipline or even threatened to discipline the candidates who responded.

As the 2004 election approached, Right to Life once again prepared to send questionnaires to all of the many judicial candidates in the state. This time, however, the organization actively looked for a sympathetic candidate willing to ask the Commission for advice. They settled on Christopher Newton. The organization sent Newton a questionnaire. When he received it, he asked James Bopp, Jr.,[1] counsel for Right to Life, "what he was trying to do to

---

[1] Mr. Bopp, lead counsel in this case, has been involved in other cases. He argued *White* before the Supreme Court and was

(continued...)

me." After he spoke with Bopp, Newton concluded that he wasn't sure whether he could answer the questionnaire. Bopp urged Newton to sign letters addressed to the Commission requesting an opinion as to whether it would violate the Indiana Code to respond to the questionnaire. Newton said he agreed to sign the letters "as a favor to Mr. Bopp because I had an internship with him as a law student in 1987 and 1988" and because Bopp assured Newton that he would not be "part of any lawsuit." Newton then asked Babcock if she had received his letters, and when she said she hadn't, he told her not to worry because "I don't want to answer [the questionnaire]." Newton later stated that "irrespective of the Judicial Canons," he "would not have answered the Survey." Right to Life's effort to recruit a chilled speaker had failed.

Also in 2004, Right to Life sent the questionnaire to all judicial candidates in the state. An accompanying letter explained that Right to Life "produces a voter guide which lists candidate responses to a survey covering issues of concern to our constituency" and that candidates "choosing not to complete the survey will be identified with a 'refused to respond' notation." The letter urged candidates to contact the Commission about the questionnaire.

The questionnaire included a synopsis of *White* and stated that Right to Life did not believe that responding to the questionnaire would violate the Indiana Code of Judicial Conduct. The questionnaire included nine statements and four possible responses: Agree, disagree, undecided, or decline. "Decline" was explained to mean that the candidate believed that he must decline to

---

[1] (...continued)
also counsel in *Pennsylvania Family Institute* and *Alaska Right to Life*.

respond based on the applicable Canons of Judicial Conduct. Examples of the statements are:

> I believe that the unborn child is biologically human and alive and that the right to life of human beings should be respected at every stage of their biological development.

> I believe that there is no provision in our current Indiana Constitution which is intended to protect a right to abortion.

Only eight candidates responded and, of those, only two provided substantive answers. The latter both checked "agree" next to each statement on the questionnaire, and both have stated that they were never threatened with discipline for providing the responses.

The remaining six responses contained a variety of explanations as to why the candidate would not answer. One candidate sent a letter stating that he thought that, under the applicable canons, it would be inappropriate to answer. He later explained that he did not rely on the canons, but rather had a personal feeling as to his role as a judge which made him think that answering would be inappropriate. The other five declined, but all later explained that it was their own views, not the canons or the Commission, that led them to decline. Three said they consulted with Babcock as to whether they could answer. She said they could, but they personally felt it was inappropriate. Another, who also discussed the matter with Babcock, said he was not threatened with discipline. One judge, who did not talk with Babcock, said that the canons merely reinforced his personal opinion regarding the perception of potential litigants were he to answer.

No enforcement actions were initiated based on the 2004 questionnaire. In fact, there is no evidence that an

enforcement action has ever been initiated based on a candidate's answering a questionnaire.

Nevertheless, Right to Life contends that the canons inhibit judicial candidates from stating their views on the issues and therefore violate Right to Life's first amendment right to receive and publish protected speech. On that basis, the organization claims to have standing.

Viewed somewhat skeptically, the situation is a chess game. Candidates may not want to answer the questions and would perhaps be happy to have the Code as a reason to decline. When that is true, Right to Life, while ostensibly asserting the right of candidates to speak, may, in fact, be acting against what the candidates see as their best interests. And probably much to Right to Life's dismay, the Commission, by taking no action against candidates, is simply not playing. The voters? One can hope that they can discern when a candidate is ducking a legitimate question and when she is legitimately refusing to become a pawn. Perhaps because of the strange alignment of interests, the plaintiffs have a problem showing that there is a case or controversy.

Article III, § 2 of the Constitution "limits the 'judicial power' to the resolution of 'cases' and 'controversies.'" *McConnell v. FEC*, 540 U.S. 93, 225 (2003). A case or controversy requires a claim that is ripe and a plaintiff who has standing. The two concepts require related but distinct inquiries: "Whereas ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action." *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 n.1 (3rd Cir. 1996). To have standing, a plaintiff must have a cognizable injury that is causally connected to the alleged conduct and is capable of being redressed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

Obviously, Right to Life recognizes that it, itself, is not subject to the Judicial Code, and as we said, its claim is based on a "right to listen." Although the First Amendment does not refer to a right to listen, in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976), the Court determined that "the protection afforded is to the communication, to its source and to its recipients both." When one person has a right to speak, others hold a "reciprocal right to receive" the speech. *Id.* at 757. A precondition of the right to receive, however, is the existence of a "willing speaker." *Id.* At 756. It follows, then, that in order to assert its claim, Right to Life must establish the existence of a candidate who wants to answer the questionnaire. If there is no willing speaker, or if no speaker has been subjected to sanctions based on the Code, Right to Life does not have standing.

Despite recognizing that its claim is for a right to listen, Right to Life nevertheless contends that *Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d 224 (7th Cir. 1993), requires that we find standing in this case. There is a significant and obvious difference, however, between the case before us and *Buckley*—or *White*, for that matter. Neither *White* nor *Buckley* is a right-to-listen case. More importantly, in both, the plaintiffs were themselves judicial candidates whose right to speak was constrained. In *White*, Gregory Wersal was a candidate for associate justice of the Minnesota Supreme Court. In *Buckley*, the plaintiff, Robert C. Buckley, was a justice on the Appellate Court of Illinois. He was running, ultimately unsuccessfully, for a seat on the Illinois Supreme Court. He circulated campaign literature saying he had never written an opinion reversing a rape conviction. The Judicial Inquiry Board filed charges against him. He filed suit and ran for the supreme court again, and again he was unsuccessful, but he retained his seat on the

appellate court. At this point, the Illinois Judges Association intervened in Buckley's lawsuit, which was then consolidated with a similar case. Right to Life is right that we had no trouble finding standing in that case. But, as should be obvious, what that case had and the present case lacks are plaintiffs who wanted to speak but felt constrained not to because of the Judicial Code or who were being disciplined for speaking out in violation of the Code.

In a right-to-listen case, Right to Life would have standing if there are otherwise willing speakers who are constrained by the Judicial Code. Right to Life says there are. We cannot agree. No judicial candidate in Indiana has been disciplined for a violation of the canon at issue. The two candidates who answered the questionnaire in 2004 have stated that they have no fear of disciplinary action for doing so. In addition, of the remaining six who responded to Right to Life but did not answer the questions, clearly none stated that they declined to answer based on the canon. Some mentioned the canon but went on to say that they were relying on their own personal feeling as to what was appropriate for a judicial candidate to say. Right to Life attempted to put words in the candidates' mouths by setting out a footnote to the response "decline" on the questionnaire. The footnote seems to be an attempt to indicate that the only reason for declining would be the Code. The individual responses show that is not true and negate any force that the footnote could conceivably have. In addition, the organization's targeted, chosen speaker, Newton, turned out to be unwilling to speak regardless of the Code. Right to Life has failed to establish standing to bring this action.

Our decision is in line with the previously mentioned decisions of the Courts of Appeals for the Third Circuit and the Ninth Circuit. In *Pennsylvania Family Institute*,

plaintiffs had argued that if a candidate responded "Decline to Answer" with its accompanying footnote referencing the judicial code, he was communicating a belief that they were prohibited from speaking by the Code. The court said that perhaps some of the candidates, in fact, did believe they were prohibited by the Code, but, nevertheless, in order to have standing, the plaintiffs must "at least demonstrate that but for a regulation, a speaker subject to it would be willing to speak." In *Alaska Right to Life*, the court looked at ripeness. As here, there was no evidence of a real threat of enforcement; accordingly, the case was not ripe. The court said that the district court should have declined jurisdiction for lack of a justiciable case or controversy. Like those cases, the case before us does not present a case or controversy. Right to Life has no standing to bring the case, and it should have been dismissed.

The decision of the district court that Canon 5A(3)(d)(i) and (ii) is unconstitutional is REVERSED. We REMAND the case to the district court with instructions to dismiss it.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*