## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 09-2963

TORREY BAUER, DAVID CERTO, and
INDIANA RIGHT TO LIFE, INC.,

*Plaintiffs-Appellants,*

*v.*

RANDALL T. SHEPARD, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 3:08-CV-196-TS—**Theresa L. Springmann**, *Judge*.

ARGUED DECEMBER 3, 2009—DECIDED AUGUST 20, 2010

Before EASTERBROOK, *Chief Judge*, and MANION and EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. The Supreme Court held in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) (*White I*), that elected judges, and candidates for judicial office, have a right under the first amendment to declare their legal views to the electorate during their campaigns. The decision left open myriad questions

of implementation, and litigation has ensued across the country in those states that give the voters some say in choosing judges—either through direct election or by retention votes on judges who came to office by appointment. Recently we held that Wisconsin violated the Constitution by forbidding judges to be members of political parties, but that rules restricting partisan activities (such as endorsing a candidate for non-judicial office), and personal solicitation of funds, are valid. *Siefert v. Alexander*, 608 F.3d 974 (7th Cir. 2010). Today's appeal concerns provisions of Indiana's Code of Judicial Conduct. Some judges in Indiana are appointed by the Governor but must run in retention elections. Others are directly elected. Article VII of Indiana's Constitution provides the details.

**I**

Indiana Right to Life, Inc., sends questionnaires to candidates for election or retention, asking recipients to state, among other things, whether they agree with *Roe v. Wade*, 410 U.S. 113 (1973), which held many forms of abortion legislation unconstitutional, and whether they subscribe to propositions such as: "I believe that the unborn child is biologically human and alive and that the right to life of human beings should be respected at every stage of their biological development." (The district court's opinion includes excerpts that convey the gist of all nine questions.) Most recipients have either ignored this questionnaire or told Indiana Right to Life that they fear giving answers could jeopardize

their judicial careers because of provisions in the state's Code of Judicial Conduct.

Indiana Right to Life filed suit seeking to have these provisions held invalid, but its suit was dismissed for want of standing, because no person actually or potentially covered by the Code was a plaintiff. *Indiana Right to Life, Inc. v. Shepard*, 507 F.3d 545 (7th Cir. 2007). Indiana Right to Life then recruited a candidate for judicial office (Torrey Bauer) and a sitting judge (David Certo) as plaintiffs to join it in this new suit. The candidate and the judge both say that they refrain from speaking about abortion, and other controversial topics, because they fear the prospect of sanctions under the Code. Bauer answered the group's 2008 questionnaire but says that he will keep silent in the future because of the risk this would pose to his judicial career should he be elected. He expresses concern that his 2008 answers may come back to haunt him should he be elected. Certo has not answered the group's questionnaire in any year. He, too, says that the Code has led to silence.

While this suit was pending in the district court, Indiana substantially amended its Code of Judicial Conduct, in light of changes to a model code published by the American Bar Association. The revised Code, which took effect on January 1, 2009, is the focus of this appeal—though plaintiffs also want an injunction against one provision that has been removed from the Code but was in force when Bauer answered the 2008 questionnaire.

Plaintiffs challenge four provisions (or associated groups of provisions) in the current Code and one provi-

sion in the version applicable to 2008. The first comprises Rules 2.10(B) and 4.1(A)(13), which forbid judges and candidates in judicial elections to make commitments that are inconsistent with the impartial performance of judicial office. The parties call these rules the "commits clauses." Canon 5A(3)(d) of the older Code covered similar ground but was broader; it is the provision relevant to Bauer's 2008 answers. The second is Rule 2.11(A), which requires recusal when a judge's impartiality "might reasonably be questioned." This the parties call the "recusal clause." Plaintiffs direct special fire at subsection 2.11(A)(5), which requires recusal if the judge "has made a public statement . . . that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy." This specifies a concrete consequence of violating the commits clauses. The third group comprises Rule 4.1(A)(1) and (2), which limits the political activities of Indiana's judges (the parties call these the "partisan-activities clauses"), and the fourth comprises limits on fundraising set out in Rule 4.1(A)(4) and (8) (the "solicitation clauses").

Defendants are the members of two bodies: the Indiana Commission on Judicial Qualifications and the Indiana Disciplinary Commission. Some of the defendants are judges (Randall Shepard, the lead defendant, is the state's Chief Justice), but they are sued in their capacity as members of these commissions rather than as judges. The Commission on Judicial Qualifications receives and investigates complaints against judges and candidates for judicial office. It has some enforcement power over

minor offenses and can issue public admonitions if the subject agrees; but only the state's Supreme Court can remove a judge from office or impose substantial discipline, and only a judicial body (such as a court of appeals) can remove a judge from a particular case under the recusal clause. As a practical matter, an injunction forbidding the Commission to bring any supposed violation of the contested clauses to the attention of the state's Supreme Court would give plaintiffs the relief they want. The Indiana Disciplinary Commission investigates and prosecutes cases of misconduct by attorneys; again only the state judiciary can take any significant disciplinary action. We do not refer to the Disciplinary Commission again; every reference to "the Commission" is to the Indiana Commission on Judicial Qualifications.

The district court deemed moot Bauer's challenge to the pre-2009 version of the Code. The court concluded that plaintiffs have standing to challenge the version now in force and held that all of the contested provisions are constitutional. 634 F. Supp. 2d 912 (N.D. Ind. 2009).

## II

Defendants contend that plaintiffs lack standing to sue. Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury. See, e.g., *Summers v. Earth Island Institute*, 129 S. Ct. 1142 (2009); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102–04 (1998). Bauer and Certo have not been injured

yet, but the existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as "injury" for the purpose of standing. See *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Brandt v. Winnetka*, No. 09-3709 (7th Cir. July 20, 2010); *520 South Michigan Avenue Associates, Ltd. v. Devine*, 433 F.3d 961 (7th Cir. 2006). We held in *Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d 224 (7th Cir. 1993), another pre-enforcement suit by a judge who disagreed with a state's limits on campaign speech, that standing had been established. This case is not materially different. Because Bauer and Certo have standing, it is unnecessary to decide whether Indiana Right to Life independently has standing.

The district court thought that Bauer's challenge to the pre-2009 Code became moot when the Code was amended. To say that a claim is moot is to say that it is too late for the judiciary to affect anyone's entitlements. With respect to Bauer's claim, however, the suit is too early rather than too late. It is unripe, not moot.

If Bauer should be elected in 2010 or later, the Commission might open a proceeding based on his answers in 2008, and the Indiana Supreme Court might remove him from office or discipline him in some other fashion. The amendment of the Code in 2009 does not eliminate the possibility of prosecuting and punishing earlier violations. Nor does the preliminary injunction preventing implementation of former Canon 5A(3)(d), which was in force when Bauer answered the 2008

questionnaire but has since been vacated. An expired or vacated injunction does not prevent a unit of government from punishing conduct, committed before the vacatur, that violates its laws. See *Crane v. Indiana High School Athletic Association*, 975 F.2d 1315, 1318–19 (7th Cir. 1992); *Hoskins Lumber Co. v. United States*, 20 F.3d 1144 (Fed. Cir. 1994). Cf. *Hampton Tree Farms, Inc. v. Yeutter*, 956 F.2d 869, 871 (9th Cir. 1992) ("[O]nce an injunction in a civil case has been invalidated, rights granted under the injunction no longer exist and cannot be enforced."). So the dispute is not moot.

But before Bauer can face any consequence for his answers in 2008, a series of events must happen: (a) he must be elected to the state judiciary; (b) the Commission must decide to prosecute, even though an injunction was outstanding when Bauer gave his answers, and even though the Commission has *never* prosecuted any judge who answered the questionnaire (as about 10 judges or candidates did in full in 2008; about 20 more answered some questions); and (c) the Supreme Court of Indiana must impose discipline. That's too many unlikely steps to justify constitutional adjudication. See *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *Brandt v. Winnetka*; and *Lawson v. Hill*, 368 F.3d 955 (7th Cir. 2004).

Because Canon 5A(3)(d) is no longer in force, neither Bauer nor anyone else can be "chilled" by the risk of future punishment. When deciding what to say or avoid today, any judge or judicial candidate looks to the current Code, not to provisions that were abrogated at the end of 2008. There is accordingly no need for prospec-

tive relief concerning pre-2009 rules. If the Commission ever hales Bauer (or anyone else) before the Supreme Court of Indiana on a charge of violating the former Canon 5A(3)(d), a defense based on the first amendment can be raised and adjudicated in the regular course.

**III**

*Siefert* disposes of one set of issues in this appeal and strongly influences another. We start with the fundraising question.

Rule 4.1(A) of Indiana's Code of Judicial Conduct provides:

> Except as permitted by law,\* or by Rules 4.1(B), 4.1(C), 4.2, 4.3, and 4.4, a judge or a judicial candidate\* shall not: . . .
>
> > (4) solicit funds for, pay an assessment to, or make a contribution\* to a political organization or a candidate for public office; . . .
> >
> > (8) personally solicit\* or accept campaign contributions other than through a campaign committee authorized by Rule 4.4 . . . .

The asterisks, which are part of the Code, denote defined terms. The definitions say that "law" includes constitutions, statutes, rules, and decisional law; that "contribution" include both financial and in-kind support "which, if obtained by the recipient otherwise, would require a financial expenditure"; and that "personally solicit" means "a direct request made by a judge or a judicial candidate for financial support or in-kind services,

whether made by letter, telephone, or any other means of communication."

*Siefert* dealt with this provision of Wisconsin's judicial-ethics rules:

> A judge, candidate for judicial office, or judge-elect shall not personally solicit or accept campaign contributions. A candidate may, however, establish a committee to solicit and accept lawful campaign contributions. The committee is not prohibited from soliciting and accepting lawful campaign contributions from lawyers. A judge or candidate for judicial office or judge-elect may serve on the committee but should avoid direct involvement with the committee's fundraising efforts. A judge or candidate for judicial office or judge-elect may appear at his or her own fundraising events. When the committee solicits or accepts a contribution, a judge or candidate for judicial office should also be mindful of the requirements of SCR 60.03 and 60.04(4).

Wisconsin Supreme Court Rule 60.06(4). (The language we have quoted is from the version effective when *Siefert* was decided; Rule 60.06(4) has since been amended slightly.) The court held that this rule is consistent with the Constitution. We invited the parties to file supplemental memoranda discussing *Siefert*'s effect on this litigation. Indiana contends that its solicitation rules match Wisconsin's in all material respects and that *Siefert* therefore controls. Plaintiffs acknowledge that the *rules* are fundamentally the same but contend that the

parties' *situations* differ: Judge Certo wants to raise money from family members and former classmates at college and law school, as well as the general public and lawyers at large.

For the purpose of a personal-solicitation rule such as this, the fact that the judge went to law school at the same time as a potential donor cannot make a difference. The potential for actual or perceived mutual back scratching, or for retaliation against attorneys who decline to donate, discussed in *Siefert*, is the same whether or not the judge knows the potential donor's first name. Asking family members for support poses less of this risk—unless the judge plans to ask distant as well as immediate relatives. Laws need not contain exceptions for every possible situation in which the reasons for their enactment are not present. It is the nature of rules to be broader than necessary in some respects. *Siefert* shows that Indiana's rules are not facially unconstitutional. Indiana may well be willing to make exceptions for close relatives—recall that Rule 4.1(A) begins "[e]xcept as permitted by law" and defines "law" to include both regulations and decisional law. Rule 3.7(A)(2) already contains one exception for solicitations from a judge's family. A federal court should not assume that a state will act unreasonably. Judge Certo should follow Indiana's procedures for obtaining advice with respect to contributions from family members.

A month after we released our opinion in *Siefert*, the sixth circuit concluded that a personal-solicitation rule is unconstitutional. *Carey v. Wolnitzek*, 2010 U.S. App.

LEXIS 14367 (6th Cir. July 13, 2010). The panel in *Carey* did not question the propriety of limits on in-person solicitation, where the possibility of reward or retaliation is greatest, but concluded that Kentucky's rule is substantially overbroad because it covers solicitation by mass mailing. A machine-generated letter with the judge's machine-generated signature is not materially different from a machine-generated letter with a campaign committee's imprimatur, the court concluded. Certo has not made anything of the fact that the definition of "personally solicit" in Indiana's Code includes letters, so it is unnecessary to address the distinction drawn in *Carey* between in-person and written solicitations. A conflict among the circuits preceded *Siefert*. Compare *Republican Party of Minnesota v. White*, 416 F.3d 738, 763–66 (8th Cir. 2005) (en banc) (*White II*) (holding solicitation rules unconstitutional), and *Weaver v. Bonner*, 309 F.3d 1312, 1322–23 (11th Cir. 2002) (same), with *Stretton v. Disciplinary Board*, 944 F.2d 137, 144–46 (3d Cir. 1991) (holding valid a rule similar to Indiana's). Nothing we can do here could create harmony among the circuits, so there is no reason to depart from the approach taken so recently in this circuit.

*Siefert* also affects analysis of the partisan-activities rules, subsections (1) and (2) of Rule 4.1(A). We repeat the introductory clause to provide context:

> Except as permitted by law,\* or by Rules 4.1(B), 4.1(C), 4.2, 4.3, and 4.4, a judge or a judicial candidate\* shall not:
>
> > (1) act as a leader in or hold an office in a political organization;\*

(2) make speeches on behalf of a political organization;

(3) publicly endorse or oppose a candidate for any public office . . . .

*Siefert* held that Wisconsin's equivalent of Rule 4.1(A)(3) is constitutional. Our plaintiffs do not challenge that subsection, but they do challenge subsections (1) and (2). Plaintiff Certo contends that he wants to serve as a delegate at the Indiana State Republican Convention, speak at political clubs on behalf of persons running for judicial office as Republicans, speak to students on behalf of the Republican Party in general, and encourage the public at large to donate money to the Republican Party. The Republican Party is a "political organization," which the Code defines as "a political party or other group sponsored by or affiliated with a political party or candidate, the principal purpose of which is to further the election or appointment of candidates for political office."

Although *Siefert* did not address limits on leadership roles in political parties or making speeches on behalf of political organizations, the way in which it analyzed public endorsements (see 608 F.3d at 983–88) establishes that subsections 4.1(A)(1) and (2) are valid. *White I* permits a candidate for judicial office (or retention in office) to speak freely in support of his own election; *Siefert* concluded that this does not allow a judge to use the prestige of the office to assist other persons. That kind of electoral activity on behalf of third parties

is covered, we held, by the balancing approach that *Pickering v. Board of Education*, 391 U.S. 563 (1968), adopts for speech by public employees—and by two of *Pickering*'s best-known sequels, *Civil Service Commission v. Letter Carriers*, 413 U.S. 548 (1973), and *Broadrick v. Oklahoma*, 413 U.S. 601 (1973), which hold that the Hatch Act, 5 U.S.C. §§ 7321–26, and comparable state laws are compatible with the first amendment.

The Hatch Act and similar state laws limit the ability of public employees to engage in politics. They can join political parties, but they can't distribute political literature at work, hold office in political parties, or make speeches on behalf of candidates for political office. (Different employees are subject to different restrictions; the most stringent ones apply to those, such as agents of the FBI, that Congress has thought should be apolitical.) *Siefert* holds that similar limitations for judges are valid, for three principal reasons: first, judges no less than FBI agents must be seen as impartial if judicial decisions are to be accepted by the public, and participation in politics undermines the appearance of impartiality; second, judges are not entitled to lend the prestige of office (which after all belongs to the people, not to the temporary occupant) to some other goal; third, states have a compelling interest in "preventing judges from becoming party bosses or power-brokers" (608 F.3d at 987), something that would undermine *actual* impartiality, as well as its appearance. Those considerations support limits on political leadership and speechifying as fully as they support limits on partisan endorsements (the subject of *Siefert*).

Rule 4.1(A)(2) says that judges cannot make speeches "on behalf of" political organizations. This probably equates to acting as a party's representative; it is therefore doubtful that this rule forbids all of the activity in which Judge Certo wishes to engage (though Rule 4.1(A)(1) assuredly forbids him from attending a political convention as a delegate). Kentucky's political-activity rule, held invalid in *Carey*, is much broader than Indiana's, forbidding a judge even to reveal his political affiliation. (*Siefert* held that such a rule in Wisconsin violates the first amendment.) To the extent there is uncertainty about what it means to speak "on behalf of" a political organization, Indiana provides means of clarification. Judge Certo should use them. The Commission already has issued several clarifying advisory opinions, which we need not recount. For current purposes it is enough to say that the principal applications of subsections 4.1(A)(1) and (2) are valid, which means that they cannot be enjoined across the board. (We discuss later how Indiana's system of resolving marginal or otherwise uncertain matters of application affects plaintiffs' contention that all of the rules are unconstitutionally vague.)

The desire to prevent judges from using the prestige of office for other ends underlies a great deal of the Code of Judicial Conduct for United States Judges. Federal judges can't endorse political candidates or participate in fundraising, even for nonpartisan institutions such as law schools. A judge can't serve on the board of a charitable organization if that organization is involved in litigation—and the fact that the judge

plans to recuse from cases for or against the organization does not permit him to serve on the board. The judge cannot accept most positions on governmental panels outside the judicial branch. These rules, and other related ones, are in Canons 4 and 5 of the Code of Judicial Conduct for United States Judges and are elaborated in many advisory opinions. Canon 5 also forbids a judge to act as a leader in a political organization, make speeches "for" a political organization, and so on. If subsections 4.1(A)(1) and (2) of Indiana's Code are unconstitutional, so are Canons 4 and 5 of the federal judges' Code. We very much doubt that *White I* licenses federal and state judges to give stump speeches for candidates running for President, senator, governor, or mayor, or act as leaders of political parties.

Plaintiffs say that a judge who does not identify himself *as* a judge when making a political speech, or serving as an officer or delegate in a political party, has not misused the prestige of the office and does not imperil the public's belief in the impartiality of the judiciary. Yet the audience (or at least the reporters covering the speech) knows who is on the bench and thus might think that the judiciary is behind the endorsement, or implicitly threatening retaliation against those who do not accept the judge's recommendation. The Court remarked in *Letter Carriers* that one principal justification for the Hatch Act is the preservation of public confidence in the bureaucracy. 413 U.S. at 565. That is even more true about rules that keep judges out of active politics. See *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2266–67 (2009). The judicial system depends on

its reputation for impartiality; it is public acceptance, rather than the sword or the purse, that leads decisions to be obeyed and averts vigilantism and civil strife.

That judges can recuse when their favored political candidates are litigants is not an answer to this concern. Many a case presents political issues without involving a politician. Political platforms, and candidates, take strong positions on health care, torts, labor relations, crime, immigration, abortion, taxes, and a hundred more contentious issues. Unless a judge who speaks on behalf of a party, or serves as a party's officer, recuses in all of these cases—which is to say, almost every case that comes before a court—the public would have good reason to believe that the judge is deciding according to the party's platform rather than the rule of law. Allowing judges to participate in politics would poison the reputation of the whole judiciary and seriously impair public confidence, without which the judiciary cannot function. Preserving that confidence is a compelling interest. No one could contemplate with equanimity the prospect of a state's chief justice also being the head of a political party and doling out favors or patronage, or deciding who runs for legislative office. States are entitled to ensure not only that judges behave in office with probity and dignity, but also that their conduct makes it possible for them to serve impartially. But the politician-judge will be disqualified so often that he will have the equivalent of a paid vacation, while other judges must work extra to protect litigants' entitlement to expeditious decisions.

*Letter Carriers* said that it is constitutional to curtail bureaucrats' political activity to ensure public confidence that civil servants "administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party." 413 U.S. at 564–65. Exactly the same can be said about judges and the judiciary. When a state requires judges to stand for office, it cannot insist that candidates remain silent about why they rather than someone else should be elected. That's the holding of *White I*. But the rationale of *Letter Carriers* remains, and is not undercut by *White I*, for political races other than the judge's own. Subsections 4.1(A)(1) and (2) are constitutional.

Although *Wersal v. Sexton*, 2010 U.S. App. LEXIS 15664 (8th Cir. July 29, 2010), recently held that Minnesota's equivalents of Rule 4.1(A)(3) (the no-endorsement rule) and Rule 4.1(A)(4) and (8) (the solicitation limits) violate the first amendment, it did not discuss (or even cite) *Pickering*, *Letter Carriers*, or any of the Supreme Court's other decisions concerning restrictions on public employees' political activities. The majority in *Wersal* concluded that the court's en banc decision in *White II* requires the application of strict scrutiny to all ethical rules that affect either judicial campaigns or judges' participation in campaigns for other offices. We are unpersuaded and shall stick with *Siefert*'s analysis, which differentiates what judges can do in their own campaigns (the subject of *White I*) from how judges can participate in other persons' campaigns (the subject of *Letter Carriers* and similar decisions).

**IV**

Rules 2.10(B) and 4.1(A)(13) are the "commits clauses":

> [Rule 2.10(B)] A judge shall not, in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial* performance of the adjudicative duties of judicial office.

> [Rule 4.1(A)] Except as permitted by law,* or by Rules 4.1(B), 4.1(C), 4.2, 4.3, and 4.4, a judge or a judicial candidate* shall not: . . . (13) in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial* performance of the adjudicative duties of judicial office.

The Code defines "impartial" as "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." Plaintiffs Bauer and Certo say that these rules have discouraged them from answering Indiana Right to Life's questionnaire, and the group relates that most judges who have replied have said the same thing; only a handful of judges and judicial candidates in Indiana have stated their positions on all of the nine questions.

Some, perhaps many, of the state's judges and judicial candidates may be using the commits clauses as a pretext to keep out of a political minefield. For no

matter what a person says in response to Indiana Right to Life's questionnaire, some readers are going to be unhappy and will vote against the candidate as a result. It is hard to see how judges and candidates could have a substantial fear of adverse consequences under the *current* version of Indiana's Code. None of the nine questions calls for a "commitment" or "promise" on any issue. A judge who answers yes to the first proposition ("I believe that the unborn child is biologically human and alive and that the right to life of human beings should be respected at every stage of their biological development") has not committed to defying *Roe v. Wade* and its sequels. The proposition concerns morals, not conduct in office. Statements of views on moral and legal subjects do not imply that the speaker will act in accord with his preferences rather than the law. Every judge enforces laws and applies judicial decisions for which he would not have voted.

Similarly, a judge who states that he thinks *Roe v. Wade* wrongly decided has not committed to disregard that decision. Justices White and Rehnquist dissented in *Roe* itself, explaining at length why they thought the majority mistaken. But this did not commit them to any particular outcome in a future dispute about abortion. Many a judge dissents in one case but later follows the majority decision on the basis of *stare decisis*—and occasionally a judge who has written a decision, and thus commits to its correctness, writes a decision overruling his earlier opinion after concluding that he erred. See, e.g., *United States v. Scott*, 437 U.S. 82 (1978) (Rehnquist, J.), overruling *United States v. Jenkins*, 420

U.S. 358 (1975) (Rehnquist, J.). A judge whose mind is open to new evidence and arguments is not "committed" to any outcome in tomorrow's litigation.

*White I* holds that judges and judicial candidates are entitled to announce their views on legal and political subjects that will come before them as judges. 536 U.S. at 788. That's all Indiana Right to Life's questionnaire asks them to do. Defendants observe that some judges *do* answer the questionnaire, and that, even under the pre-2009 version of the Code, none has been charged by the Commission with misconduct. Most judges and judicial candidates have views on issues such as those the questionnaire poses, and are entitled to have them. Making these views known does not call their impartiality into question. "[S]ince avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest". *Id.* at 778.

Still, given the posture of this case—the suit was dismissed on the pleadings—we must assume that plaintiffs Bauer and Certo are in fear of sanctions under the Code if they answer the questions. This fear may be exaggerated, but if it is real (as we must assume it is), and not irrational (it isn't), it stifles speech. So we must decide whether there is anything wrong with the commits clauses. Plaintiffs say that they are unconstitutional because overbroad and vague.

Plaintiffs treat as "overbroad" any law forbidding any speech that is constitutionally protected. It is not clear to

us that any speech covered by the commits clauses is constitutionally protected, as *White I* understands the first amendment. How could it be permissible to "make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office"? The rule's own category (promises "inconsistent with the impartial performance of" judicial duties) identifies the sorts of speech that *White I* thought might be curtailed. A commits clause "secures a basic objective of the judiciary, one so basic that due process requires it: that litigants have a right to air their disputes before judges who have not committed to rule against them before the opening brief is read*." Carey* at *43–44. Judges must decide on the basis of the law and the case's facts, not on "express . . . commitments that they may have made to their campaign supporters or to others*." Buckley*, 997 F.2d at 227.

Although the Court held in *White I* that judges may state their views on contestable and controversial subjects—such as whether the exclusionary rule is wise policy, or whether mandatory minimum sentences should be repealed—it did not hold that judges may make commitments or promises about behavior in office. Imagine a judge or judicial candidate who said: "I will issue a search warrant every time the police ask me to." That speaker is promising to defy the judicial oath of office. Or imagine the statement: "I will always rule in favor of the litigant whose income is lower, so that wealth can be redistributed according to the principles of communism." (More plausibly, a candidate might say that he will award damages against drug companies,

whether or not the drug has been negligently designed or tested, because they charge "too much" for their products.) Again that person is promising to disobey the law and disregard the litigants' entitlements. Nothing in *White I* deals with statements of this flavor, or any other promise to act on the bench as a partisan of a political agenda.

But it is unnecessary to decide whether *some* protected speech might come within the scope of the commits clauses. For when the Supreme Court speaks of overbreadth, it does not mean a statute or rule that catches the occasional protected tidbit. All rules are overbroad in that sense. "Overbreadth" in the Supreme Court's jurisprudence has to do with *substantial* amounts of protected speech. A law is unconstitutionally overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted). See also, e.g., *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010). Plaintiffs do not seriously contend that the commits clauses are overbroad in *that* sense.

Under Indiana's language, judges and candidates can tell the electorate not only their general stance ("tough on crime" or "tough on drug companies") but also their legal conclusions ("I would have joined Justice White's dissent in *Roe*" or "the death penalty should be treated as cruel and unusual punishment" or "I am a textualist and will not resort to legislative history" or "I will

follow *stare decisis*" or "I am a progressive who will use a living-constitution approach"). Judges who have announced these views, on or off the bench, sit every day without being thought to have abandoned impartiality. Indeed, judges who have announced legal views in exceptional detail, by writing a treatise about some subject (Weinstein on Evidence, or Martin on Bankruptcy) have not made an improper "commitment," even though a litigant can look up in the treatise exactly how the judge is apt to resolve many disputes. A judge who promises to ignore the facts and the law to pursue his (or his constituents') ideas about wise policy is problematic in a way that a judge who has announced considered views on legal subjects is not. The commits clauses condemn the former and allow the latter. That's because they are limited to commitments that are inconsistent with impartial adjudication and thus differ considerably from the rule at issue in *Carey*, where the sixth circuit expressed concern that limiting *all* commitments on "issues" would prevent a judicial candidate from declaring support for the rule of law or adherence to *stare decisis. Carey* at *45–49.

As plaintiffs see things, however, the phrase "inconsistent with the impartial performance of the adjudicative duties of judicial office" saves the commits clauses from a first amendment challenge by making them so vague that they violate the due process clauses. For what promises *are* "inconsistent with the impartial performance of the adjudicative duties of judicial office"? Neither the commits clauses nor the Code's definitions pin the meaning down. We have given a few exam-

ples, such as a promise to issue search warrants without bothering to read the affidavits, but the principle is clear only in these extremes. A candidate who says that he will never let a prisoner off on a "technicality" could be promising to ignore the fourth amendment (if in his view the rule against unreasonable searches and seizures is a "technicality") but could mean instead only that he plans to enforce the harmless-error and plain-error doctrines, see Fed. R. Crim. P. 52; Ind. R. App. P. 66(A), under which errors that don't impair a defendant's substantial rights do not justify setting aside a jury's verdict.

Context may help to disambiguate a statement, but there is an irreducible risk that a promise may be misunderstood—or that the Commission and the Supreme Court of Indiana may treat as "inconsistent with the impartial performance of the adjudicative duties of judicial office" even the sort of statements that are squarely protected by *White*. We think that statements such as "judges have been too ready to find antitrust problems with mergers" or "mandatory minimum sentences are unjust, and I will read those statutes narrowly" or "drunk drivers are a menace and should be dealt with severely" or "abortion should be freely available, and I will grant a minor's application for bypass of parental consent when a statute gives me that discretion" are outside the scope of the commits clauses. But will the Commission and the state judiciary agree?

The best way to find out is to wait and see. The Commission issues advisory opinions that reduce uncertainty, and when the Commission brings a proceeding the

state judiciary will issue an opinion that makes the rule more concrete. Plaintiffs want us to deem the law vague by identifying situations in which state officials *might* take an untenably broad reading of the commits clauses, and then predicting that they *will* do so. It is far preferable, however, and more respectful of our judicial colleagues in Indiana, to assume that they will act sensibly and resolve the open questions in a way that honors candidates' rights under the first amendment.

When a statute is accompanied by an administrative system that can flesh out details, the due process clause permits those details to be left to that system. Parts of the Hatch Act are every bit as vague as the commits clauses, but in *Letter Carriers* the Court held that problems of implementation could be tackled by administrative adjudication. 413 U.S. at 580. Similarly, in *Parker v. Levy*, 417 U.S. 733 (1974), the Court held that an article of the Uniform Code of Military Justice making it a court-martial offense to engage in "conduct unbecoming an officer and a gentleman" is not unconstitutionally vague, because military tribunals have elaborated on what is "unbecoming" for an officer and made it more specific than the unadorned words. The National Labor Relations Act is full of vague terms, and the National Labor Relations Board has yet to make all of them concrete, but no one supposes that the whole Act could be chucked out. The Justices have been chary of holding laws unconstitutional "on their face" precisely because they have recognized that vagueness will be reduced through a process of interpretation. See also, e.g., *United States v. Skoien*, No. 08-3770 (7th Cir. July 13, 2010)

(en banc), slip op. 17. Advisory opinions under the Code of Judicial Conduct are a more appropriate procedure than summary condemnation by a federal court before the Commission has an opportunity to tackle the ambiguities in the 2009 version of the Code. (Another way to reach the same result would be via *Pullman* abstention, see *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), withholding federal decision until the state agency has had a chance to reduce the ambiguity.)

It is not as if Indiana could make everything clear by changing a few words. The main source of ambiguity in the commits clauses is the protean word "impartial." It has been around for a long time and has resisted precise definition. It is easy to say that a judge who has a financial stake in the outcome is not impartial. But how about a judge who receives a campaign contribution from one side? A big campaign contribution? A *whopping* campaign contribution? See *Caperton* ($3 million from one donor, more than all other contributions combined). A judge who has promised constituents to use tort law to soak out-of-state manufacturers for the benefit of in-state plaintiffs? Plaintiffs have not suggested any revised wording that would be more specific but achieve the state's objective. Courts and administrative bodies provide greater certainty by examples (advisory opinions stating that such-and-such behavior is, or is not, compatible with "the impartial performance of the adjudicative duties of judicial office").

Plaintiffs contend that the Commission has its mind made up on many subjects and therefore is not a

suitable body to disambiguate the Code. Yet declarations by the Commission (more often, by its staff rather than its members) that the body views one or another kind of statement "with disfavor" (or some similar phrase) does not call the administrative process into question. When the Judicial Conference's Committee on Codes of Conduct, the body that issues advisory opinions interpreting the Code of Conduct for United States Judges, issues an opinion or guide saying that some particular conduct is problematic, it is doing exactly the same thing. People may not always like the information they receive, but these examples curtail ambiguity. Anyway, the Commission is a prosecutorial body in Indiana; final decisions are made by the state's Supreme Court. Under the Hatch Act, the Uniform Code of Military Justice, and the National Labor Relations Act, a prosecutor brings charges of wrongdoing, and the ensuing adjudication adds to the law's specificity. Just so in Indiana. The Commission's prosecutorial role sets in motion a process that yields greater certainty.

## V

The recusal clause, Rule 2.11(A)(5), names one consequence of violating the commits clauses. Rule 2.11(A) provides:

> A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality* might reasonably be questioned, including but not limited to the following circumstances: . . .

> (5) The judge, while a judge or a judicial candi-
> date,* has made a public statement, other than
> in a court proceeding, judicial decision, or
> opinion, that commits or appears to commit
> the judge to reach a particular result or rule in
> a particular way in the proceeding or contro-
> versy.

A judge's failure to recuse, when this clause applies, is a ground for discipline. Indiana Admission & Discipline Rule 25(III)(A)(7).

What we have said about the commits clauses implies the validity of the recusal clause. States have a strong interest in ensuring that judges come to their cases without precommitments. See *Caperton* and the many decisions it cites. But there is more to be said. The recusal clause does not present a constitutional issue at all.

The recusal clause applies to a judge in his role as public employee, not his role as candidate. It specifies how a public employee will perform official duties (or, rather, which public employee will be assigned to which duties). *Garcetti v. Ceballos*, 547 U.S. 410 (2006), holds that speech as part of a public employee's duties is categorically outside the scope of the first amendment. The state, as employer, may control how its employees perform their work, even when that work includes speech (as a judge's job does). Rule 2.11(A)(5) represents a decision by the State of Indiana to assign to each lawsuit a judge who has not made any statement "that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy." That decision is unexceptionable.

No public employee is entitled to do any particular task; a state may select the employee who can best do the job. *Gregory v. Ashcroft*, 501 U.S. 452 (1991), tells us that this means that a state may choose to assign appeals to younger judges (the Court held that the Age Discrimination in Employment Act does not apply to an elected judiciary). Likewise a state may decide to assign each case to a judge whose impartiality is not in question. All Rule 2.11(A)(5) does is allocate cases among judges, just as 28 U.S.C. §455(a) does for federal judges. States are entitled to protect litigants by assigning impartial judges before the fact, as well as by removing partial judges afterward. As we put it in *Siefert*, 608 F.3d at 985, "[i]t is small comfort for a litigant who takes her case to state court to know that while her trial was unfair, the judge would eventually lose an election".

We modify the district court's judgment to provide that the challenge to the 2008 version of the Code is dismissed as unripe, not as moot. As modified, the judgment is

AFFIRMED.