LOKEN, Circuit Judge,
with whom WOLLMAN, Circuit Judge, joins,
concurring in the judgment.
In Republican Party of Minnesota v. White, the Supreme Court invalidated a provision of the Minnesota Code of Judicial Conduct prohibiting a candidate for judicial office from announcing his or her views on disputed legal or political issues because it “burdenfed] a category of speech that is ‘at the core of our First Amendment freedoms’ — speech about the qualifications of candidates for public of *1032 fice.” 586 U.S. 765, 774, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (“White J”). The Court applied the strict scrutiny test because neither party urged that a different test be applied. Id. Justice Anthony Kennedy joined the opinion but also stated what I believe to be the operative principle that precludes censorship of “core” political speech in judicial elections:
Minnesota may choose to have an elected judiciary. It may strive to define those characteristics that exemplify judicial excellence. It may enshrine its definitions in a code of judicial conduct. It may adopt recusal standards more rigorous than due process requires, and censure judges who violate these standards. What Minnesota may not do, however, is censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer. Deciding the relevance of candidate speech is the right of the voters, not the State.
536 U.S. at 794, 122 S.Ct. 2528 (Kennedy, J., concurring).[13] Thus, I agree with Judge Beam that the majority’s reliance on a broadly defined state interest “in maintaining the appearance of impartiality,” ante at 1022, would likely result in upholding restrictions on candidates’ core political speech that are prohibited by White I.
The restrictions at issue in this case, however, apply to campaign activities that implicate the First Amendment but do not directly burden speech by judicial candidates regarding their qualifications for office. In Republican Party of Minnesota v. White, 416 F.3d 738, 763-64 (8th Cir.2005) (en banc) (“White II”), we held, citing cases that hardly demanded the conclusion, that rules restricting judicial candidates in soliciting campaign contributions are subject to strict scrutiny. There is now a conflict in the circuits on that issue. See Bauer v. Shepard, 620 F.3d 704, 710 (7th Cir.2010), and cases cited. I favor stringent First Amendment scrutiny, so long as it accounts for genuine differences in the type of speech being restricted and in the interests underlying the restriction. Thus, I dissented from the striking down of a broader solicitation clause in White II, id. at 766, agreeing with Judge John R. Gibson that the majority’s application of strict scrutiny illustrated the “futility of requiring unattainable precision.” Id. at 785 (Gibson, J., dissenting). For that reason, plus the more limited restrictions here at issue, I cannot join Judge Beam’s dissent in this case.
1. The personal solicitation clause is part of Minnesota’s regulation of judicial campaign financing. Campaign financing is heavily regulated at all levels of federal, state, and local government, albeit with substantial First Amendment oversight. The majority effectively demonstrates why direct personal solicitations by judicial candidates creates a substantial risk of “quid pro quo” relationships that threaten the compelling state interest of judicial impartiality recognized in White I — “the lack of bias for or against either party to the proceeding,” 536 U.S. at 775, 122 S.Ct. 2528. One can legitimately question the effectiveness of this restriction by asking whether the “risk that judges will be *1033 tempted to rule a particular way because of contributions” is “significantly reduced by [only] allowing the candidate’s agent to seek these contributions ... on the candidate’s behalf.” Weaver v. Bonner, 309 F.3d 1312, 1322-23 (11th Cir.2002). But the personal solicitation restriction is narrowly aimed at what appears to be the greatest threat to actual impartiality arising out of the essential need to fund judicial campaigns. Because Rules 4.2 and 4.4 allow all judicial candidates adequate opportunity to fund their campaigns, I agree with the majority that the personal solicitation clause survives a proper level of strict scrutiny.
2. The endorsement clause, too, warrants a different quantum of strict scrutiny because it “differentiates what judges can do in their own campaigns (the subject of White I) from how judges can participate in other persons’ campaigns (the subject of Letter Carriers[14] and similar decisions).” Bauer, 620 F.3d at 713. The clause certainly triggers the First Amendment concern underlying the decision in White I. As Judge Beam points out, “Endorsing a well-known candidate is often a highly effective and efficient means of expressing one’s own views on issues.” Post at 1051. But the extent of the restriction on core political speech is de minimis. Saying, “I endorse candidate Michele Bachmann,” is barred, but saying, “I agree with candidate Michele Bachmann on every issue,” is permitted.
My decision to uphold the endorsement clause is based on a different compelling state interest than the impartiality interest(s) on which the majority relies, namely, Minnesota’s asserted interest in protecting the political independence of its judiciary. See In re Amendment of the Code of Judicial Conduct, No. C4-85-697, slip op. at 4 (Minn. Sept. 14, 2004), quoted in White II, 416 F.3d at 752 n. 7.[15] Although judicial independence if broadly defined can be viewed as interchangeable with the interest in judicial impartiality, the narrow interest in judicial independence I will address is distinct from the impartiality interests asserted in White I — avoiding bias for or against parties in particular judicial proceedings — and therefore was not considered by the Supreme Court in deciding that case, see 536 U.S. at 775 n. 6, 122 S.Ct. 2528.
In an oft-quoted passage, Alexander Hamilton summarized the importance of judicial independence: “The independence of the judges, once destroyed, the constitution is gone; it is a dead letter, it is a vapor which the breath of faction in a moment may dissipate.”[16] More recently, columnist George Will concisely declared, “What primarily stands between us and misrule ... is the Constitution, buttressed by an independent judiciary.” Op-Ed., Wash. Post, Dec. 22, 2011, at A19. “Those who wrote our constitutions knew from history and experience that it was necessary to protect ... against judges too responsive to the voice of higher authority.” *1034 Duncan v. Louisiana, 391 U.S. 145, 156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).
A judicial candidate’s endorsement of a candidate for executive or legislative office does more than indirectly announce the judicial candidate’s views on particular issues. See SiefeHrt v. Alexander, 608 F.3d 974, 983 (7th Cir.2010). An endorsement links the judicial candidate’s political fortunes to a particular person, who may then come to hold office in a coordinate branch of government. This is antithetical to any well-considered notion of judicial independence — that we are a “government of laws, not of men.” This kind of personal affiliation between a member of the judiciary and a member of the political branches raises the specter — readily perceived by the general public — that the judge’s future rulings will be influenced by this political dependency. And the perception of bias is not limited to cases in which the endorsed politician is a party; it extends to any case of sufficient significance to the endorsee that he or she may privately signal the politically-desired result to the devoted judge. Can anyone doubt this is a compelling state interest? No less a statesman than Chief Justice John Marshall declared that the “greatest scourge ... ever inflicted was an ignorant, a corrupt, or a dependent Judiciary.” Proceedings and Debates of the Virginia State Convention of 1829-30, p. 619 (1830), quoted in United States v. Hatter, 532 U.S. 557, 569, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001).
The Declaration of Independence identified as one of the “Injuries and Usurpations” King George inflicted on the States, “He has made judges dependent on his Will alone....” ¶ 11. Modern history demonstrates that this threat to freedom persists. Litigants in the former Soviet Union routinely confronted “telephone justice,” in which Communist Party leaders would call judges and instruct them how to rule in key cases. Alexander Solzhenitsyn vividly described this kind of dependent judiciary: “In his mind’s eye the judge can always see the shiny black visage of truth — the telephone in his chambers. This oracle will never fail you, as long as you do what it says.” The Gulag Archipelago, vol. III 521 (1974), quoted in Jeffrey Kahn, The Search for the Rule of Law in Russia, 37 Geo. J. Int’l L. 353, 385 (2006). Predictably, decades of telephone justice came to permeate judicial attitudes and surely corroded public confidence in the Russian judiciary. The lingering adverse effects were apparent to Justice Breyer when he visited a convention of Russian judges in 1993, after Boris Yeltsin’s election:
Telephone justice ... occurred when the party boss called judges and told them how to decide the outcome of a particular case. And the assembled judges spoke about the practice very frankly----The Russian judges, in turn, asked me whether telephone justice exists in the United States. When I told them that we do not have such a practice, the Russian judges looked at me incredulously. What happens, the judges asked, when the politicians who helped you obtain your judgeship call in a favor regarding a pending case? Again, I told them that no such call would be placed.... [T]hey thought that I was merely being discreet in an effort to protect my supporters.
Judicial Independence, 95 Geo. L.J. at 904-05. When pervasive, this perception corrodes public trust in the courts. Public opinion that judges decide cases based upon their personal political views is unhealthy. But public opinion that judges decide cases based upon the wishes of their political cronies would be far worse. “The rule of law, which is a foundation of freedom, presupposes a functioning judiciary respected for its independence, its professional attainments, and the absolute *1035 probity of its judges.” Lopez Torres, 552 U.S. at 212, 128 S.Ct. 791 (Kennedy J., concurring).
Minnesota’s Code of Judicial Conduct protects the State’s interest in the appearance as well as the reality of a politically independent judiciary. See Rule 1.2 (judges shall act “at all times in a manner that promotes public confidence in the independence ... of the judiciary.”); Rule 2.4(B) (“A judge shall not permit ... political ... interests or relationships to influence the judge’s judicial conduct or judgment.”); Rule 2.4(C) (“A judge shall not convey ... the impression that any person or organization is in a position to influence the judge.”). I conclude that the endorsement clause narrowly addresses the compelling state interest in preventing judicial dependency, while leaving judicial candidates ample freedom to announce their views on issues that may affect their qualifications for judicial office. For these reasons, while one may legitimately debate the extent to which the endorsement prohibition will accomplish this intended purpose, in my view it is narrowly-tailored and therefore survives an appropriate level of strict constitutional scrutiny.

. Significantly, in my view, since White I, Justice Kennedy and the Court have twice upheld measures ensuring that elected state judges are independent and impartial that did not burden the core political speech of judicial candidates seeking to be elected. See Caperton v. A.T. Massey Coal Co., 556 U.S. 868. 129 S.Ct. 2252, 2266-67. 173 L.Ed.2d 1208 (2009) (opinion of the Court), a recusal case, and N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 212, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) (Kennedy J., concurring), where the Court unanimously upheld New York’s special structuring of its judicial election process.

. U.S. Civil Serv. Comm’n v. Nat’l Ass’n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

. See also Peterson v. Stafford, 490 N.W.2d 418, 420 (Minn.1992); In re Lord, 255 Minn. 370, 97 N.W.2d 287, 289 (1959).

. Alexander Hamilton, The Examination, Com. Advertiser (New York), Feb. 26, 1802, as reprinted in XXV The Papers of Alexander Hamilton 525 (Harold C. Syrett ed., 1977), quoted by Chief Justice John G. Roberts, Jr., in his 2006 Year-End Report on the Federal Judiciary, Third Branch (Admin. Office of the U.S. Courts, Wash. D.C.), Jan. 2007, at 6-7, available at http://www.supremecourt.gov/ publicinfo/year-end/2006year-endreport.pdf, and by Justice Stephen Breyer in Judicial Independence: Remarks by Justice Breyer, 95 Geo. L.J. 903, 905 (2007).