**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RANDOLPH WOLFSON,
    *Plaintiff-Appellant*,

   v.

COLLEEN CONCANNON; LOUIS
FRANK DOMINGUEZ; PETER J.
ECKERSTROM; GEORGE H. FOSTER;
GUSTAVO ARAGON, JR.; ROGER
BARTON; S' LEE HINSHAW; DAVID
STEVENS; J. TYRELL TABER;
LAWRENCE F. WINTHROP, in their
official capacities as members of the
Arizona Commission on Judicial
Conduct; ANNA MARY GLAAB;
MARET VESSELLA, Chief Bar
Counsel of the State Bar of Arizona,
    *Defendants-Appellees*.

No. 11-17634

D.C. No.
3:08-cv-08064-
FJM

OPINION

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, Senior District Judge, Presiding

Argued and Submitted En Banc
September 9, 2015—San Francisco, California

Filed January 27, 2016

Before: Sidney R. Thomas, Chief Judge, and Diarmuid F.
O'Scannlain, Susan P. Graber, William A. Fletcher, Ronald
M. Gould, Marsha S. Berzon, Richard C. Tallman, Johnnie
B. Rawlinson, Consuelo M. Callahan, Morgan Christen,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Berzon

_____

### SUMMARY[*]

_____

### Civil Rights

The en banc court affirmed the district court's summary
judgment in favor of defendants in an action brought by
Randolph Wolfson, an Arizona state judicial candidate in
2006 and 2008, who challenged several provisions of the
Arizona Code of Judicial Conduct regulating judicial
campaigns.

Wolfson challenged: (1) the Personal Solicitation Clause,
Rule 4.1(A)(6); (2) the Endorsement Clauses, Rule 4.1(A)(2),
(3), (4); and (3) the Campaign Prohibition, Rule 4.1(A)(5).
Together, the clauses did not allow Wolfson, while running
for judicial office, to personally solicit funds for his own
campaign or for a campaign for another candidate or political
organization, to publicly endorse another candidate for public
office, to make speeches on behalf of another candidate or

_____

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

political organization, or to actively take part in any political campaign.

Applying the Supreme Court's intervening decision in *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015), the en banc court first held that the district court erred when it bypassed strict scrutiny in favor of the intermediate level of scrutiny used by the Seventh Circuit. The panel nevertheless held that the district court arrived at the correct result because the Personal Solicitation Clause, the Endorsement Clauses, and the Campaign Prohibition Rule all withstood First Amendment analysis under strict scrutiny. The en banc court held that Arizona has a compelling interest in upholding public confidence in the judiciary and that in light of *Williams-Yulee*, the Rules were narrowly tailored to its compelling interest.

Concurring, Judge Berzon stated that in light of *Williams-Yulee*, she was in general agreement with Judge Gould's opinion for the en banc court. Judge Berzon concurred in order to highlight her concern about articulating the governmental interest at stake in regulating judicial elections. Judge Berzon stated that there is a separate, broader governmental basis for regulating judicial behavior that goes beyond a concern with biased decisionmaking in individual cases. In her view, the societal interest in maintaining an independent judiciary more accurately captures the reasons to limit judicial candidates' endorsements and campaigning activity. Judge Berzon also noted that the majority opinion did not distinguish between sitting judges who run for judicial office and judicial candidates who are not yet, and may never be, judges.

**COUNSEL**

Anita Y. Milanovich (argued) and James Bopp, Jr., The Bopp Law Firm, Terre Haute, Indiana, for Plaintiff-Appellant.

Paula S. Bickett (argued), Chief Counsel, Civil Appeals; Thomas C. Horne and Mark Brnovich, Arizona Attorneys General; Charles Grube, Senior Agency Counsel, Tempe, Arizona, for Defendants-Appellees Commission Members.

Kimberly A. Demarchi and Peter R. Wand, Lewis and Roca LLP, Phoenix, Arizona, for Defendant-Appellee Maret Vessella.

Igor V. Timofeyev, Paul Hastings LLP, Washington, D.C.; George W. Abele, Paul Hastings LLP, Los Angeles, California; George T. Patton, Jr., Bose McKinney & Evans LLP, Washington, D.C.; Karl J. Sandstrom, Perkins Coie LLP, Washington, D.C.; Joshua L. Kaul, Perkins Coie LLP, Madison, Wisconson, for Amicus Curiae Conference of Chief Justices.

Randolph Sherman and Robert Grass, Kaye Scholer LLP, New York, New York; Richard F. Ziegler and Justin O. Spiegel, Jenner and Block, New York, New York; Matthew Menendez and Alicia L. Bannon, New York, New York; Hayley Gorenberg, New York, New York; and J. Gerald Hebert and Megan P. McAllen, Washington, D.C., for Amicus Curiae Brennan Center for Justice at NYU School of Law, Arizona Judges' Association, American Judicature Society, Justice at Stake, Campaign Legal Center, and Lambda Legal Defense.

Robert W. Ferguson, Attorney General, and Alan D. Copsey, Deputy Solicitor General, Olympia, Washington, for Amicus Curiae States of Washington, Hawai'i, and Oregon.

## OPINION

GOULD, Circuit Judge:

Plaintiff-Appellant Randolph Wolfson, an Arizona state judicial candidate in 2006 and 2008, challenges several provisions of the Arizona Code of Judicial Conduct regulating judicial campaigns. Specifically, Wolfson challenges: (1) the Personal Solicitation Clause, Rule 4.1(A)(6)[1]; (2) the Endorsement Clauses, Rule 4.1(A)(2), (3), (4)[2]; and (3) the Campaign Prohibition, Rule 4.1(A)(5)[3]. Together, the clauses do not allow Wolfson, while running

---

[1] "A judge or a judicial candidate shall not . . . personally solicit or accept campaign contributions other than through a campaign committee authorized by Rule 4.4 . . . ." Ariz. Code of Judicial Conduct Rule 4.1(A)(6) (2014), http://www.azcourts.gov/portals/137/rules/Arizona%20Code%20of%20Judicial%20Conduct.pdf.

[2] "A judge or a judicial candidate shall not . . . (2) make speeches on behalf of a political organization or another candidate for public office; (3) publicly endorse or oppose another candidate for any public office; (4) solicit funds for or pay an assessment to a political organization or candidate, make contributions to any candidate or political organization in excess of the amounts permitted by law, or make total contributions in excess of fifty percent of the cumulative total permitted by law . . . ." *Id.* at 4.1(A)(2), (3), (4).

[3] "A judge or a judicial candidate shall not . . . actively take part in any political campaign other than his or her own campaign for election, reelection or retention in office." *Id.* at 4.1(A)(5).

for judicial office, to personally solicit funds for his own campaign or for a campaign for another candidate or political organization, to publicly endorse another candidate for public office, to make speeches on behalf of another candidate or political organization, or to actively take part in any political campaign.

On May 21, 2008, Wolfson filed a complaint against the Commissioners of the Arizona Commission on Judicial Conduct and Chief Bar Counsel Robert B. Van Wyck (collectively "the Commission") in the United States District Court for the District of Arizona, alleging that the campaign regulations violated his First Amendment rights of freedom of speech and freedom of association.[4]

The district court disagreed and granted the Commission's motion for summary judgment.[5] *Wolfson v. Brammer*, 822 F. Supp. 2d 925, 931–32 (D. Ariz. 2011). The district court held that strict scrutiny was inappropriate, and instead adopted the Seventh Circuit's approach of applying an intermediate level of scrutiny to assess judicial campaign regulations like Arizona's Rules. *Id.* at 929–30 (citing *Siefert v. Alexander*, 608 F.3d 974, 983–88 (7th Cir. 2010) and

---

[4] Wolfson's complaint also named as defendants Commissioners of Arizona Supreme Court Disciplinary Commission, but Wolfson has since voluntarily dismissed all claims against these defendants. *Wolfson v. Brammer*, 822 F. Supp. 2d 925, 926–27 (D. Ariz. 2011).

[5] The district court originally dismissed Wolfson's claims as moot because the election had passed and Wolfson was no longer a judicial candidate. *Wolfson v. Brammer*, No. CV-08-8064-PHX-FJM, 2009 WL 102951, at *3 (D. Ariz. Jan. 15, 2009). We disagreed, and reversed and remanded the case. *Wolfson v. Brammer*, 616 F.3d 1045, 1066–67 (9th Cir. 2010). We now review the decision made on remand.

*Bauer v. Shepard*, 620 F.3d 704, 713 (7th Cir. 2010)). Applying this level of scrutiny, the district court upheld Arizona's Rules as striking an appropriate "constitutional balance" between judicial candidates' First Amendment rights and the state's compelling interests in protecting litigants' due process rights and in ensuring the impartiality of the judiciary. *See id.* at 931–32.

Wolfson timely appealed. After an original panel hearing, *Wolfson v. Concannon*, 750 F.3d 1145 (9th Cir. 2014), the case was ordered to be reheard en banc, *Wolfson v. Concannon*, 768 F.3d 999 (9th Cir. 2014). Following this decision but before we rehear the case, the Supreme Court decided *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015).

**I**

The First Amendment, applicable to the States through the Due Process Clause of the Fourteenth Amendment, says that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n.1 (1995). Wolfson's appeal requests that we address: (1) the district court's application of intermediate scrutiny to assess Arizona's restrictions on judicial candidate speech; and (2) the impact of *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015), on Arizona's Personal Solicitation Clause, Endorsement Clauses, and Campaign Prohibition.

**II**

We first address whether the district court was correct in adopting the Seventh Circuit's intermediate level of scrutiny

to assess Arizona's judicial speech restrictions. We hold that, in light of *Williams-Yulee*, it was not.

The Supreme Court has repeatedly held that "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339–40 (2010) (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)) (internal quotation marks omitted). This "requires us to err on the side of protecting political speech rather than suppressing it." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007).

In *Williams-Yulee*, a plurality of the Supreme Court applied similar reasoning when addressing the level of scrutiny appropriate for assessing Florida's Code of Judicial Conduct Canon 7C(1), a prohibition on personal solicitation during judicial campaigns. *See* 135 S. Ct. at 1664–65 ("As we have long recognized, speech about public issues and the qualifications of candidates for elected office commands the highest level of First Amendment protection."). Picking up where the Court left off in *Republican Party of Minn. v. White*, 536 U.S. 765, 774–75 (2002) (*White I*) (assuming without deciding that strict scrutiny was appropriate for restrictions on judicial candidates' ability to announce their views on various legal issues), the *Williams-Yulee* plurality held that strict scrutiny was warranted. *Williams-Yulee*, 135 S. Ct. at 1665. "A State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest." *Id.*

We agree with the plurality and hold that strict scrutiny is appropriate here. Even before *Williams-Yulee*, other courts had come to similar conclusions. *See Carey v. Wolnitzek*,

614 F.3d 189, 199–200 (6th Cir. 2010); *Republican Party of Minn. v. White*, 416 F.3d 738, 748–49 (8th Cir. 2005) (en banc) (*White II*); *Weaver v. Bonner*, 309 F.3d 1312, 1315, 1322–23 (11th Cir. 2002). Additionally, our holding is not limited to Arizona's Personal Solicitation Clause, which has no meaningful difference from Florida's Canon 7C(1).[6] We also hold that strict scrutiny is similarly appropriate for Arizona's Endorsement Clauses and for its Campaign Prohibition. A decision otherwise would be contrary to the Supreme Court's broad reasoning in *Williams-Yulee*, which addressed not just a prohibition on personal requests for campaign contributions, but state restrictions on judicial candidate speech generally. *See Williams-Yulee*, 135 S. Ct. at 1665. A decision otherwise also would put us in conflict with the approach taken by the Sixth, Eighth, and Eleventh Circuits.

---

[6] Florida's Canon 7C(1) reads: "A candidate, including an incumbent judge, for a judicial office that is filled by public election between competing candidates shall not personally solicit campaign funds, or solicit attorneys for publicly stated support, but may establish committees of responsible persons to secure and manage the expenditure of funds for the candidate's campaign and to obtain public statements of support for his or her candidacy. Such committees are not prohibited from soliciting campaign contributions and public support from any person or corporation authorized by law." Code of Judicial Conduct for the State of Florida 38 (2014), http://www.floridasupremecourt.org/decisions/ethics/Code_Judicial_Conduct.pdf. Arizona's Personal Solicitation Clause similarly reads: "A judge or a judicial candidate shall not . . . personally solicit or accept campaign contributions other than through a campaign committee . . . ." Ariz. Code of Judicial Conduct Rule 4.1(A)(6) (2014), http://www.azcourts.gov/portals/137/rules/Arizona%20Code%20of%20Judicial%20Conduct.pdf.

### III

Federal, state, and local governments have struggled to meet strict scrutiny when defending speech restrictions. *See, e.g.*, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231–32 (2015); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813–14, 816 (2000); *OSU Student All. v. Ray*, 699 F.3d 1053, 1062–64 (9th Cir. 2012); *United States v. Alvarez*, 617 F.3d 1198, 1215–18 (9th Cir. 2010). To overcome such a high standard of review, the government is required to prove that "the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United*, 558 U.S. at 340 (quoting *Wis. Right to Life*, 551 U.S. at 464). Following *Williams-Yulee*,[7] we hold that Arizona meets that standard for all of the challenged restrictions on judicial candidate speech.

### A.  The Personal Solicitation Clause

Wolfson contends that Arizona's Personal Solicitation Clause, which prohibits him, while running for judicial office, from personally soliciting funds for his own campaign, fails strict scrutiny. He argues that Arizona's interest is not narrowly tailored, and that *Williams-Yulee* does not control our decision because Florida and Arizona have different interests in upholding their respective personal solicitation prohibitions.

---

[7] With the exception of the level of scrutiny addressed in Part II, above, Chief Justice Roberts' opinion in *Williams-Yulee* garnered a majority. *Williams-Yulee*, 135 S. Ct. at 1662.

1. Compelling Interest

Wolfson does not contend that Arizona lacks a compelling interest behind this solicitation prohibition. Instead, he argues that Arizona's interest is significantly different than Florida's interest in Canon 7C(1), making the Court's strict scrutiny analysis in *Williams-Yulee* inapplicable to Arizona's Clause. Attempting to distinguish the two states' interests, Wolfson first points to Florida's Code of Judicial Conduct Canon 1 and its commentary: "Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. The integrity and independence of judges depend in turn upon their acting without fear or favor." Code of Judicial Conduct for the State of Florida 6 (2014), http://www.floridasupremecourt.org/decisions/ethics/Code _Judicial_Conduct.pdf. He compares this language to that of Arizona's Code of Judicial Conduct Rule 1.2 and Comment 5, which he contends demonstrate that Arizona's interest is protecting the public's perception of "the judge's honesty, impartiality, temperament, or fitness." Ariz. Code of Judicial Conduct Rule 1.2 (2014), cmt. n.5, http://www.azcourts.gov/ portals/137/rules/Arizona%20Code%20of%20Judicial%20 Conduct.pdf. An interest in judicial "honesty, impartiality, temperament, or fitness," Wolfson argues, is different than a concern for "fear or favors."

This is a distinction without a material difference. Even if we consider the language to which Wolfson points, the Supreme Court did not uphold Florida's prohibition because of an interest in curbing "fear or favors." Instead, the Court was broad in its language and reasoning. "We have recognized the 'vital state interest' in safeguarding 'public confidence in the fairness and integrity of the nation's elected

judges,'" *Williams-Yulee*, 135 S. Ct. at 1666 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)), because the "judiciary's authority . . . depends in large measure on the public's willingness to respect and follow its decisions." *Id.* Arizona's interest, outlined in Rule 1.2 and its comments, is similar, if not identical.

Moreover, the Supreme Court recognized that the "concept of public confidence in judicial integrity does not easily reduce to precise definition." *Id.* at 1667. Even if Arizona adopted slightly different language for its articulation of its interest,[8] Arizona is similarly interested in upholding the judiciary's credibility. There are no magic words required for a state to invoke an interest in preserving public confidence in the integrity of the state's sitting judges.

Arizona's interest behind its Personal Solicitation Clause is compelling.

### 2. Narrowly Tailored

Wolfson's arguments that Arizona's Personal Solicitation Clause is not narrowly tailored are precluded by *Williams-Yulee*. First, Wolfson contends that the Personal Solicitation Clause is overbroad because it covers solicitation methods, such as mass mailings and speeches to large groups, that

---

[8] Wolfson's articulation of Arizona's interest stresses selective words and ignores the plain language of Rule 1.2 which is nearly identical to the interests Florida stated in Canon 1. "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Ariz. Code of Judicial Conduct Rule 1.2 (2014), http://www.azcourts.gov/portals/137/rules/Arizona%20Code%2 0of%20Judicial%20Conduct.pdf.

would not result in a *quid pro quo*. However, the Supreme Court rejected the argument that the state may prohibit only solicitation methods that are the most likely to erode public confidence. *Williams-Yulee*, 135 S. Ct. at 1671. The Court held that the argument "misperceives the breadth of the compelling interest" and that, though that "interest may be implicated to varying degrees in particular contexts, . . . the interest remains whenever the public perceives the judge personally asking for money." *Id.*

Second, Wolfson argues that the Personal Solicitation Clause is not the least restrictive means to effectuate Arizona's interest because Arizona could have adopted contribution limitations or a mandatory recusal rule. Again, the Supreme Court did not consider this argument persuasive. *Id.* at 1671–72. Forced recusals would disable jurisdictions with a small number of judges, erode public confidence in the judiciary, and create an incentive for litigants to make contributions for the sole purpose of forcing the judge to later recuse himself or herself from the litigant's cases. *Id.* Contribution limits would be similarly ineffective. The improper appearance of a judicial candidate soliciting money would still remain and, even though the Court had previously held that contribution limitations advance the interest against *quid pro quo* corruption, a state is not restricted to pursuing its interest by a single means. *Id.* at 1672.

We hold that Arizona's Personal Solicitation Clause is narrowly tailored to achieve the state's compelling interest. The state reasonably wants to uphold the public's perception of publicly elected judges as being fair-minded and unbiased, and may do so by prohibiting judicial candidates from making personal solicitations.

### B. The Endorsement Clauses and the Campaign Prohibition

Wolfson also argues that Arizona's Endorsement Clauses and Campaign Prohibition are not narrowly tailored to Arizona's compelling interest in public confidence in the judiciary's integrity.[9] These Clauses prohibit him, while running for judicial office, from personally soliciting funds for a campaign for another candidate or political organization, publicly endorsing or making a speech on behalf of another candidate for public office, or actively taking part in any political campaign. Wolfson contends that the prohibitions are underinclusive, overbroad, and generally not tailored enough to the interest at hand. We disagree. Arizona can properly restrict judges and judicial candidates from taking part in political activities that undermine the public's confidence that judges base rulings on law, and not on ?party affiliation.

### 1. Underinclusivity

Wolfson contends that Arizona's Endorsement Clauses and Campaign Prohibition are underinclusive because they allow judicial candidates to receive endorsements, allow judicial candidates to endorse public officials and non-candidates, and allow other candidates to participate in judicial campaigns. "[U]nderinclusiveness can raise 'doubts

---

[9] Wolfson again does not contest that Arizona has a compelling interest in upholding the Endorsement Clauses and Campaign Prohibition. Arizona has a compelling interest in upholding the public confidence in the judiciary and furthers this interest through a ban on personal solicitation and curtailment of judicial candidates' ability to engage with the political branches of government.

about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint,'" *Williams-Yulee*, 135 S. Ct. at 1668 (quoting *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011)), and can "reveal that a law does not actually advance a compelling interest." *Id.* However, "[a] State need not address all aspects of a problem in one fell swoop" and can "focus on . . . [the] most pressing concerns." *Id.*

Once again, *Williams-Yulee* controls our reasoning. In assessing whether Florida's solicitation clause was underinclusive, the Court looked at whether Canon 7C(1) was "aim[ed] squarely at the conduct most likely to undermine public confidence in the integrity of the judiciary," "applie[d] evenhandedly to all judges and judicial candidates, regardless of their viewpoint," and was "not riddled with exceptions." *Id.* at 1668–69. We do not believe that the analysis should be any different when assessing a prohibition of endorsements or participation in political campaigns. *Williams-Yulee* may have been about a prohibition on direct candidate solicitations of campaign contributions, but the Supreme Court's reasoning was broad enough to encompass underinclusivity arguments aimed at other types of judicial candidate speech prohibitions such as Arizona's Endorsement Clauses and its Campaign Prohibition.

And both the Endorsement Clauses and Campaign Prohibition fit easily under the *Williams-Yulee* underinclusivity analysis. First, Arizona squarely aimed at preventing conduct that could erode the judiciary's credibility. When a judicial candidate actively engages in political campaigns, a judge's impartiality can be put into question, and the public can lose faith in the judiciary's ability to abide by the law and not make decisions along

political lines.    Arizona's Endorsement Clauses and
Campaign Prohibition are aimed at these valid concerns. *See*
Arizona Judicial Code of Conduct Rule 4.1, Comment 1
("Rather than making decisions based upon the expressed
views or preferences of the electorate, a judge makes
decisions based upon the law and the facts of every case.
Therefore, in furtherance of this interest, judges and judicial
candidates must, to the greatest extent possible, be free and
appear to be free from political influence and political
pressure."). Further, the Endorsement Clauses and Campaign
Prohibition apply to both judges and judicial candidates and
have few exceptions.[10]

We need not question whether Arizona could have, as
Wolfson argues, prohibited more types of endorsements or
campaign participation. "[P]olicymakers may focus on their
most pressing concerns" and the fact that the state could
"conceivably could have restricted even greater amounts of
speech in service of their stated interests" is not a death blow
under strict scrutiny. *Williams-Yulee*, 135 S. Ct. at 1668.
Arizona's Endorsement Clauses and Campaign Prohibition
are not underinclusive.

### 2.  Overinclusivity

Wolfson next contends that the Endorsement Clauses and
Campaign Prohibition are unconstitutionally overbroad
because the Campaign Prohibition bans involvement with

---

[10] Judges and judicial candidates may make limited contributions to
another candidate or political organization under Rule 4.1(A)(4) and may
engage in political activity that pertains to the legal system or attend
dinners or similar functions that do not constitute a public endorsement of
candidates under Rule 4.1(C).

ballot measures, and the Endorsement Clauses forbid judges from endorsing anyone, even candidates like the President of the United States who are highly unlikely to appear before the judge.[11] A regulation "may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted).

Again, *Williams-Yulee* forecloses Wolfson's arguments. There, the petitioner contended that even though Florida could constitutionally prevent judges from soliciting one-on-one or in person with lawyers and litigants, Canon 7C(1) was overbroad because it included a prohibition of solicitation through mass mailings. *Williams-Yulee*, 135 S. Ct. at 1670–71. The petitioner argued that the latter would have less impact on the public confidence of the judiciary. *Id.* at 1671. But the Supreme Court was not convinced, reasoning that such distinctions became so fine as to be unworkable, and in large part, Florida's restriction still left judicial candidates "free to discuss any issue with any person at any time." *Id.* at 1670–71. Further, the Court held that though

---

[11] We need not reach whether Arizona could constitutionally forbid judges from discussing ballot measures. Arizona interprets the Clauses to allow candidates to discuss any disputed issue, including those in issue-based initiatives, while cautioning that judicial candidates shall not "with respect to cases, controversies, or issues that are likely to come before the court, make pledges, promises or commitments that are inconsistent with the impartial performance of the adjudicative duties of the office" and shall "act in a manner consistent with the impartiality, integrity and independence of the judiciary." Ariz. Sup. Ct. Judicial Ethics Advisory Op. 06-05 (2006); *see also* Ariz. Sup. Ct. Judicial Ethics Advisory Op. 08-01 (2008).

these speech restrictions must be narrowly tailored, they need not be "perfectly tailored." *Id.* at 1671 (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992)). "[M]ost problems arise in greater and lesser gradations, and the First Amendment does not confine a State to addressing evils in their most acute form." *Id.*; *see also O'Toole v. O'Connor*, No. 15-3614, 2015 WL 5515061, at *5 (6th Cir. Sept. 21, 2015).

Wolfson asks us to draw a similarly unworkable and unnecessary line. Although supporting a United States presidential candidate may have less of an effect on the public confidence than endorsing or campaigning for an Arizona State senator or a local prosecutor, creating a rigid line is as unworkable as it is unhelpful. Judges engaging in political acts may present different levels of impropriety in different situations. It is not our proper role to second-guess Arizona's decisions in this regard. Much as the state drew a line between personal solicitation by candidates and by committees in order to preserve public confidence in the judiciary's integrity, *Williams-Yulee*, 135 S. Ct. at 1671, so too can the state decide that judicial candidates should not engage in legislative or executive campaigns. "These considered judgments deserve our respect, especially because they reflect sensitive choices by States in an area central to their own governance—how to select those who 'sit as their judges.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

Our conclusion is consistent with *White I*. Arizona's prohibitions do not prevent judicial candidates from announcing their views on disputed legal and political subjects. *See White I*, 536 U.S. at 788. Instead, Arizona simply makes the distinction that a judicial candidate may do so only in relation to his or her own campaign. This follows

the reasoning in *White I*, where the Supreme Court was concerned about restrictions on the ability to express legal views while campaigning, *see id.* at 770–74, not on the ability to advance the political views and aspirations of another candidate. The latter is not the kind of speech the Court in *White I* sought to protect. *See Wersal v. Sexton*, 674 F.3d 1010, 1026 (8th Cir. 2012) ("[T]he endorsement clause does not regulate speech with regard to any underlying issues, and thus the candidates are free to state their positions on these issues, in line with *White I*."); *Siefert*, 608 F.3d at 984 ("While an interest in the impartiality and perceived impartiality of the judiciary does not justify forbidding judges from identifying as members of political parties, a public endorsement is not the same type of campaign speech [as that] targeted by the impermissible rule against talking about legal issues the Supreme Court struck down in *White I*."); *Bauer*, 620 F.3d at 711–12 (holding that the reasoning employed in *Siefert* to uphold a prohibition against judicial candidate endorsements is equally applicable to a prohibition on partisan activities).

The compelling interest in preserving public confidence in the integrity of judiciary warrants a favorable view of Arizona's attempt to foreclose judicial candidates from engaging in political campaigns other than their own. The Endorsement Clauses and Campaign Prohibition are not fatally overbroad.

### 3. Least Restrictive Means

Finally, Wolfson contends that Arizona's Endorsement Clauses and Campaign Prohibition are not narrowly tailored because they do not offer the least restrictive means to further the state's interest. He argues that the Clauses do not prevent

judges from favoring certain candidates that may appear in court, and even if they did, recusal would be the best way to handle such impartiality or appearance of impartiality. The government may only "regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

But recusal is no answer at all, and this unworkable alternative was flatly dismissed in *Williams-Yulee*. A rule requiring judges to recuse themselves from every case where they endorsed or campaigned for one of the parties could "disable many jurisdictions" and cripple the judiciary. *See Williams-Yulee*, 135 S. Ct. at 1671. Four of Arizona's counties have only one superior court judge and two other counties have only two superior court judges. Arizona Judicial Branch, Fiscal Year 2014 Annual Report 4, http://www.azcourts.gov/Portals/38/2014%20Annual%20R eport.pdf. Campaigning for frequent litigants would cause an insurmountable burden that other judges and other counties may not be able to bear. Moreover, an extensive recusal record could cause the same erosion of public confidence in the judiciary that Arizona's Endorsement Clauses and Campaign Prohibition are trying to prevent.

We hold that the Endorsement Clauses and Campaign Prohibition are narrowly tailored to achieve Arizona's compelling interest.

**IV**

Even though the district court erred when it bypassed strict scrutiny in favor of the intermediate level of scrutiny

used by the Seventh Circuit, it arrived at the correct result. The Personal Solicitation Clause, Endorsement Clauses, and Campaign Prohibition all withstand First Amendment analysis under strict scrutiny. Arizona has a compelling interest in upholding public confidence in the judiciary. And in light of *Williams-Yulee*, we hold that Arizona's Rules are narrowly tailored to its compelling interest. The judgment of the district court is therefore

**AFFIRMED**.

BERZON, Circuit Judge, concurring:

Given *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015), I am in general agreement with Judge Gould's opinion for the en banc court ("main opinion"). There are two points, however, as to which the main opinion is terse, at best, and which therefore, in my view, deserve further exploration.

First, I concurred in the panel opinion to highlight my concern about articulating the governmental interests at stake in regulating judicial elections, and write separately here, too, to reiterate the same concern. *Wolfson v. Conannon*, 750 F.3d 1145, 1160 (9th Cir. 2014) (Berzon, J., concurring). The main opinion supports *all three* of Arizona's challenged restrictions on judicial candidates' behavior during judicial election campaigns on the basis of the same governmental interest — judicial impartiality. *See, e.g.*, Maj. Op. at 15–16. But three different species of speech regulation of judicial candidates are here at issue, not one. And while one of the regulations — the ban on personal solicitation — is closely

related to the restriction considered in *Williams-Yulee*, two — the bans on endorsements and campaigning for nonjudicial candidates and causes — are quite different. As to the latter two bans, I am not at all sure that the governmental interest in preventing biased judicial decisionmaking survives the compelling interest/narrowly tailored standard we are required to apply. I am convinced, however, that there is a societal interest underlying those two restrictions — maintaining an independent judiciary — that more accurately captures the reasons to limit judicial candidates' endorsements and campaigning activity, and that does meet the compelling interest/narrow tailoring requirements.

Additionally, the main opinion does not distinguish between sitting judges who run for judicial office and judicial candidates who are not yet, and may never be, judges. This distinction turns out not to be dispositive of this case, but it is worth explaining why that is so.

1. As the main opinion and the Supreme Court recognize, "[t]he concept of public confidence in judicial integrity does not easily reduce to precise definition." *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1667 (2015). In my view, this case requires us to disentangle two distinct facets of this compelling interest.

First, society has an interest in judicial impartiality that is "both weighty and narrow." *Wolfson*, 750 F.3d at 1163 (Berzon, J., concurring). This fundamental interest is enshrined in the Due Process Clause's prohibition on a judge trying a case in which she "has an interest in the outcome." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 880 (2009).

It is this impartiality concern that underlay the solicitation restriction in *Williams-Yulee* and also undergirds Arizona's ban on judges' personal solicitation of funds. "[M]ost donors are lawyers and litigants who may appear before the judge they are supporting," *Williams-Yulee*, 135 S. Ct. at 1667, and "personal solicitation by a judicial candidate 'inevitably places the solicited individuals in a position to fear retaliation if they fail to financially support that candidate,'" *id.* at 1668 (quoting *Simes v. Ark. Judicial Discipline and Disability Com'n*, 368 Ark. 577, 585 (2007)). This impartiality interest is important; its reach is also fairly limited. Impartiality's "root meaning" refers to the lack of "bias for or against either *party* to the proceeding." *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002) (emphasis in original). Restrictions that can be justified by society's interest in impartiality are those that aim at protecting the due process rights of litigants appearing before a judge in court.

There is, however, a separate, broader governmental basis for regulating judicial behavior that goes beyond a concern with biased decisionmaking in individual cases. That interest is society's concern with maintaining both the appearance and the reality of a *structurally independent* judiciary, engaged in a decisionmaking process informed by legal, not political or broad, nonlegal policy considerations. As I explained in my concurrence to the panel opinion,

> Maintaining public trust in the judiciary as an institution driven by legal principles rather than political concerns is a structural imperative. The rule of law depends upon it.
>
> The fundamental importance of this structural imperative has been recognized

from the founding of the nation. As Alexander Hamilton emphasized in *The Federalist No. 78*, the courts possess "neither FORCE nor WILL, but merely judgment . . . ." *Id.* at 433 (Clinton Rossiter ed., 1961). Deprived of those alternative sources of power, the authority of the judiciary instead "lies . . . in its legitimacy, a product of substance and perception that shows itself in the people's acceptance of the Judiciary as fit to determine what the . . . law means and to declare what it demands." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 865 (1992); *see also White*, 536 U.S. at 793 (Kennedy, J., concurring) ("The power and the prerogative of a court . . . rest, in the end, upon the respect accorded to its judgments."). It is the courts' perceived legitimacy as institutions grounded in established legal principles, not partisanship, "that leads decisions to be obeyed and averts vigilantism and civil strife." *Bauer*, 620 F.3d at 712. Loss of judicial legitimacy thus corrodes the rule of law, "sap[ping] the foundations of public and private confidence, and . . . introduc[ing] in its stead universal distrust and distress." *The Federalist No. 78*, at 438. In this sense, "[t]he rule of law, which is a foundation of freedom, presupposes a functioning judiciary respected for its independence, its professional attainments, and the absolute probity of its judges." *NY State Bd. of Elections v. Lopez Torres*,

552 U.S. 196, 212 (2008) (Kennedy, J., concurring).

This nation's political history demonstrates the disastrous effects of the perceived politicization of the courts. Charges that King George "ha[d] obstructed the Administration of Justice" and "ha[d] made judges dependent on his Will alone . . . ." were among the founding generation's justifications for the 1776 revolution. *The Declaration of Independence* para. 11 (U.S. 1776). Similar concerns apply outside the context of a monarchy: Where the judiciary is drawn into the political intrigues of its coordinate branches, the public might well "fear that the pestilential breath of faction may poison the fountains of justice. The habit of being continually marshaled on opposite sides will be too apt to stifle the voice both of law and of equity." *The Federalist No. 81*, at 452 (Alexander Hamilton) (Clinton Rossiter ed., 1961). And where the politicization of the judiciary brings it into alliance with the politicians who staff the other two branches of government, the public may no longer consider "the courts of justice . . . as the bulwark of a limited Constitution against legislative encroachments," *The Federalist No. 78*, at 437, or executive excesses. In short, when sitting judges support the campaigns of nonjudicial candidates — via endorsements, speeches, money, or other means — the public may begin to see them

not as neutral arbiters of a limited system of
governance, but as participants in the larger
game of politics.

*Wolfson*, 750 F.3d at 1164–65 (Berzon, J. concurring)
(footnotes omitted).

In short, a deep-seated interest in the structural
independence of the judiciary has been recognized as
indispensable to our constitutional order since the founding
era. *See id.* at 1164. An independent judge "must above all
things put aside his estimate of political and legislative
values" when interpreting the law. Benjamin Cardozo, *The
Nature of the Judicial Process*, 90 (1921) (internal quotation
mark omitted) (quoting Lorenz Brütt, *Die Kunst der
Rechtsanwendung*, 57 (1907)).

When judges swap endorsements with legislative or
executive candidates, or make speeches during nonjudicial
political campaigns, their political and legislative values are
brought to the fore, threatening the public's perception of
their independence. To quote again from my panel
concurrence:

> The defendants here express precisely this
> concern — that if sitting judges may support
> the campaigns of others, the public will
> perceive them as masters of the political
> game, powerbrokers "trading on the prestige
> of their office to advance other political ends
> . . . ." *Siefert*, 608 F.3d at 984; *see also* Model
> Code of Judicial Conduct R. 4.1, cmt.4 (2011)
> (justifying prohibitions on endorsements and
> speeches on behalf of other candidates as

"prevent[ing sitting judges] from abusing the prestige of judicial office to advance the interests of others"). The opposite fear is equally justified: Today's powerbroker is tomorrow's pawn, as the political winds shift and the next election cycle approaches. The endorsing judge entwines his fate with whomever he endorses and earns the enmity of his favored politician's opponents. "This kind of *personal* affiliation between a member of the judiciary and a member of the political branches raises the specter — readily perceived by the general public — that the judge's future rulings will be influenced by this political dependency." *Wersal v. Sexton*, 674 F.3d 1010, 1034 (8th Cir. 2012) (Loken, J., concurring in the judgment) (emphasis in original).

*Wolfson*, 750 F.3d at 1165 (Berzon, J., concurring).

I read neither *Williams-Yulee* nor the main opinion to say anything to the contrary. Both impartiality and independence are implicit, for instance, in the majority's reference to "the judiciary's ability to abide by the law and not make decisions along political lines." Maj. Op. at 15–16. But because First Amendment doctrine focuses on the breadth and nature of the interests at stake, it is important to be clear that the interests raised by this case are not limited to the due process concerns signaled by the term judicial impartiality.

This dual focus is particularly critical where, as in this case, the two interests affect aspects of the regulations at issue differently. The main opinion takes *Williams-Yulee*'s

reasoning regarding the personal solicitation of funds and applies it to uphold a ban on judicial candidates endorsing or campaigning for nonjudicial political candidates and organizations. But the concerns raised by these distinct activities only partially overlap. An in-person solicitation creates a unique risk of a quid pro quo arrangement, or at least the appearance of one, between a judicial candidate and a donor. *See Wersal v. Sexton*, 674 F.3d 1010, 1029 (8th Cir. 2012) (en banc). The risk of such an arrangement is more attenuated, though, when it comes to endorsements and campaigning for nonjudicial candidates and issues. Candidates can, of course, exchange endorsements in a mutually beneficial arrangement. But there may be many scenarios where "[a] judicial candidate's endorsement of an executive or legislative candidate . . . benefits the endorsee more than the endorser." *Id.* at 1049 (Beam, J., dissenting). The same can be true when a judicial candidate lends their time or credibility to a nonjudicial issue campaign.

Reframing the governmental interest underlying restrictions on judicial candidates' role in campaigns or political organizations other than their own also brings better into focus the requisite "less-restrictive means" analysis. Personal recusal is an ineffective alternative to the solicitation bar because, as *Williams-Yulee* and the majority point out, it would be problematic to have many recusals in smaller jurisdictions, and individuals would have a "perverse incentive" to donate to judges in the hopes of forcing the judge to recuse if elected. *Williams-Yulee*, 135 S. Ct. at 1671–72; Maj. Op. at 13. In contrast, recusals might be a better alternative to the endorsement and campaign bars, if the only concern were avoiding conflicts of interest. The number of nonjudicial endorsements or campaign speeches a candidate makes is likely to be far lower than the number of

individuals donating to his or her campaign. And the concern of hostile donations as "a form of peremptory strike against a judge," *Williams-Yulee*, 135 S. Ct. at 1672, disappears where the judicial candidate is the one choosing whom to endorse.

It is not clear to me, then, that the compelling interest of judicial impartiality, or the reasons for concluding that the restrictions are sufficiently narrowly focused, translate well from the solicitation realm to the practice of campaigning for or endorsing other candidates or issues. But these restrictions surely do advance the vital interest in structural judicial independence. The campaign and endorsement restrictions respond to a structural need — they restrict judges from engaging in nonjudicial campaigns, to prevent them from being entangled in the legislative and executive political process. Judges must have the confidence to stand firm against nonjudicial elected officials. That confidence could give way — or appear to give way — if judges behave just like those elected officials, by engaging in the usual, often contentious and fiercely partisan, political processes.

2. I also write to note another distinction that both the main opinion and *Williams-Yulee* elide. Both opinions lump together sitting judges running for re-election and nonjudge candidates aspiring to the office. *See, e.g.*, *Williams-Yulee*, 135 S. Ct. at 1668; Maj. Op. at 14. The main opinion does so not only with respect to the restriction directly pertinent to the judicial election, the solicitation restriction, but with respect to the two other restrictions as well.

It is worth considering whether that uniform treatment is justified. On reflection, it seems to me that competing considerations pull in various directions with regard to the

application to sitting judges and judicial candidates of the nonjudicial endorsement and campaigning restrictions. In the end, I agree with the main opinion's conclusion that all three regulations at issue are valid with respect to both groups.

First, sitting judges are already public employees. The Supreme Court has held in the *Pickering* line of cases that public employee speech may be subject to greater restrictions than the First Amendment would otherwise allow. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968). The Seventh Circuit, for instance, has applied *Pickering* to adopt a balancing test when evaluating restrictions on sitting judges' speech. *See Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010); *Siefert v. Alexander*, 608 F.3d 974 (7th Cir. 2010). But *Pickering* does not appear to apply to the speech of candidates for judicial office who are not yet public employees.

Second, the structural judicial independence interest that to me is central to upholding two of the three judicial campaign restrictions here applicable comes into full force only when the individual elected actually ascends the bench. Before that, the concern is somewhat contingent — the candidate may *become* a judge. Still, that contingency may be sufficient reason for treating a judicial candidate who is not a sitting judge according to the rules of judicial ethics. The structural independence concerns are largely aspirational, and the public perception of the judicial role may be most at the forefront during judicial elections. So drawing the line on nonjudicial political participation at the point of declaration of judicial candidacy may help to forward both the reality and the appearance of a politically independent judiciary.

Moreover, if sitting judges were subject to greater restrictions on political activity than nonjudge candidates, two individuals may end up running for the same judicial office on somewhat uneven footing. The Supreme Court has "repeatedly rejected the argument that the government has a compelling state interest in 'leveling the playing field' that can justify undue burdens on political speech." *Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2825 (2011). But those cases have concerned attempts at government intervention designed to adjust for non-governmental disparities. Here, stricter restrictions during judicial campaigns on nonjudicial endorsement and campaigning for sitting judges than for nonincumbent candidates for judicial positions would *create* the disparity, not level it. Such political participation gives judicial candidates more opportunity for exposure to the electorate, and more chance to connect with voters on nonjudicial matters they care about. The inequity of allowing some candidates for judicial office but not others those opportunities, when added to the aspirational and appearance concerns just discussed, seem sufficiently compelling to justify parallel restrictions for sitting judges and nonjudges, when both are running for the same judicial office.

In sum, I concur in the main opinion, in light of the further conclusions I reach in this concurrence.